## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## CHATTANOOGA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:19-CV-** |
| | ) | |
| **v.** | ) | **Judges _____** |
| | ) | |
| **REAL PROPERTY LOCATED AT** | ) | |
| **500 PHOENIX AVENUE** | ) | |
| **CHATTANOOGA, TENNESSEE 37411,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### VERIFIED COMPLAINT *IN REM*

Comes now the plaintiff, United States of America, by and through its attorneys, J. Douglas Overbey, United States Attorney for the Eastern District of Tennessee, and Gretchen Mohr, Assistant United States Attorney, and brings this complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions:

### NATURE OF THE ACTION

1.     In this *in rem* civil action, the United States of America seeks forfeiture of the real property having a mailing address of 500 Phoenix Avenue, Chattanooga, Tennessee 37411 (hereinafter "defendant property").

### THE DEFENDANT *IN REM*

2.     The United States seeks forfeiture of the following defendant property, with all appurtenances, improvements, and attachments thereon, which are more fully identified and more particularly described below:

IN THE HAMILTON COUNTY, STATE OF TENNESSEE, DESCRIBED AS FOLLOWS, TO-WIT:

Lot Five Hundred Sixty-Four (564), Re-subdivision of East Highlands as shown by plat of record in Plat Book 9, Page 6, Register's Office Hamilton County, Tennessee. According to said plat, said lot is more particularly described as follows: BEGINNING at a point on the East line of Phoenix Avenue one hundred thirty-eight (138) feet Northwardly as measured along the East line of Phoenix Avenue from its intersection with the North line of Chevoit Drive, if said lines are extended; thence Eastwardly one hundred thirty-five (135) feet to the West line of Lots 562; thence Northwardly along the dividing line of Lots 562 and 564, fifty-four (54) feet to the Southeast corner of Lot 563 and 564, one hundred thirty-five (135) feet to the East line of Phoenix Avenue; thence Southwardly along the East line of Phoenix Avenue, fifty-four (54) feet to the point of beginning.

Subject to restrictions as set out in instrument of record in Book 680, Page 633; as modified in Book 795, Page 682 and amended in Book 1129, Page 71, said Register's Office.

Subject to any governmental zoning and subdivision ordinances or regulations in effect thereon.

The Grantor's source of interest is a deed recorded in Book 20130, Page 159, in the Register's Office of Hamilton County, Tennessee.

This property is also commonly known as: 500 Phoenix Avenue, Chattanooga, Tennessee, this ifs for informational purposes only.

Map and Parcel #: 1470-C-020.04, this is for informational purposes only.

For further reference see Executrix's Deed filed and recorded on January 22, 2019, in Deed Book GI 11548, Page 936, in the Register's Office of Hamilton County, Tennessee, Instrument Number 2019012200339.

3. The defendant property has not been seized but is within the jurisdiction of the Court pursuant to 28 U.S.C. § 1355(b)(1)(A). The United States does not request authority from the Court to seize the defendant property at this time. The United States will, as provided by 18 U.S.C. §§ 985(b)(2) and (c)(1):

a) post notice of this action and a copy of the Complaint on the defendant property;

b) serve notice of this action on the record owner of the defendant property, and any other person or entity who may claim an interest in the defendant property, along with a copy of this Complaint;

c) execute a writ of entry for purposes of conducting an inspection and inventory of the defendant property; and

d) file a notice of *lis pendens* in the county records where the defendant property is located.

## JURISDICTION AND VENUE

4. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant property. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5. This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture of the defendant property occurred in this district.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), because the acts or omissions giving rise to the forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395(b) because the defendant property is located in this district.

## BASIS FOR FORFEITURE

7. The United States of America seeks forfeiture of the defendant property pursuant to the following:

    a) 21 U.S.C. § 881(a)(6), which authorizes forfeiture of all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of the Controlled Substances Act, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate a violation of the Controlled Substances Act, in violation of 21 U.S.C. §§ 841 and/or 846; and

    b) 18 U.S.C. § 981(a)(1)(C), which authorizes forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense.

8. Pursuant to 21 U.S.C. § 881(h), all right, title and interest in the defendant properties became vested in the United States at the time of the acts giving rise to the forfeiture.

## FACTS

9. As set forth in detail in the Affidavit of Special Agent, William C. Wise, Drug Enforcement Administration, the Government's investigation has determined that the defendant property constitutes proceeds traceable to violations of 21 U.S.C. §§ 841 and/or 846 and was derived from proceeds traceable to violations of 18 U.S.C. §§ 1956 and/or 1957. The owners of the defendant property, Jerriod Sivels, also known as "Jerriod Lee," also known as "Jerriod Sivels-Lee," also known as "Jerry," also known as "Lil Jerry," also known as "BRMG Jay," and Jamaal Parker, also known as "MAAL," also known as "MONEYMAAL," and other co-conspirators, were engaged in the distribution of cocaine that operates in Tennessee, and were laundering drug proceeds in order to hide and disguise these proceeds from law enforcement officials.

4

10.     The defendant property, therefore, is subject to forfeiture pursuant to 21 U.S.C.
§ 881(a)(6) and 18 U.S.C. § 981(a)(1)(C).


## CLAIM FOR RELIEF

11.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1
through 10 above.

## PRAYER FOR RELIEF

Wherefore, the United States of America prays:

a)     Defendant property be condemned and forfeited to the United States of America
in accordance with the provisions of law;

b)     Notice of this action be given to all persons known or thought to have an interest
in or right against the defendant property;

c)     Plaintiff be awarded its costs in this action and for such other necessary and
equitable relief as this Court deems proper.

Respectfully submitted,

J. DOUGLAS OVERBEY
United States Attorney


By:     *s/ Gretchen Mohr*
GRETCHEN MOHR
Assistant United States Attorney
800 Market Street, Suite 211
Knoxville, Tennessee  37902
(865) 545-4167

5

## **VERIFICATION**

I, William C. Wise, Special Agent, Drug Enforcement Administration, hereby verify and declare under penalty of perjury as provided by 28 U.S.C. § 1746, the following:

That I have read the foregoing Verified Complaint *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint *In Rem* and in the accompanying Affidavit are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are from information gathered by law enforcement officers, as well as my investigation of this case with the Drug Enforcement Administration.

I hereby verify and declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this __13th__ day of May, 2019.


William C. Wise
Special Agent
Drug Enforcement Administration

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | 500 Phoenix Avenue, Chattanooga, TN 37411 |

| (b) County of Residence of First Listed Plaintiff | County of Residence of First Listed Defendant | Hamilton County, Tennessee |
|---|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* | |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. | |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Gretchen Mohr, AUSA, 800 Market St., Suite 211 Knoxville, Tennessee 37902, (865) 545-4167 | |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question *(U.S. Government Not a Party)*

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☒ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 981(a)(1)(C) and 21 U.S.C. § 881(a)(6)

Brief description of cause: Forfeiture of real property that constitutes proceeds traceable to 21 U.S.C. §§ 841 and/or 846 and 18 U.S.C. §§ 1956 and/or 1957

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE Travis R. McDonough

DOCKET NUMBER 1:19-cr-46

DATE
05/21/2019

SIGNATURE OF ATTORNEY OF RECORD
s/ Gretchen Mohr

FOR OFFICE USE ONLY

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

**AFFIDAVIT IN SUPPORT OF VERIFIED COMPLAINT *IN REM***

I, William C. Wise, Drug Enforcement Administration, ("DEA') Special Agent, being duly sworn, depose and state as follows:

**Professional Training and Experience of Affiant**

1.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice.  I have been so employed for the past 20 years.  I am currently assigned to the Chattanooga Resident Office.  Prior to my current assignment, I was assigned to the Chiang Mai Resident Office, Honolulu District Office, and the Chicago Field Division.   Prior to my employment with the DEA, I was employed as an Arlington County Police Officer for approximately 5 years and 6 months in Arlington, Virginia.

3.      In connection with my official DEA duties, I investigate criminal violations of the federal narcotics laws, including but not limited to, Title 21, United States Code, Sections 841, 843, 846, and 848.  I have also been involved in various types of wire and electronic surveillance, and in the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking, and of the laundering and concealing of proceeds of drug trafficking for the past 19 years.  I have received specialized training in the enforcement of laws concerning the activities of narcotics traffickers, including four months of DEA basic training in Quantico, Virginia as well as periodic refresher training offered by the DEA.  My current assignment involves

1

investigations of high-level drug trafficking organizations in east Tennessee, north Georgia, and elsewhere.

4.      I have experience in the execution of documentary search warrants, the debriefing of defendants, witnesses, informants and other persons who have knowledge of the amassing, spending, converting, transporting, distributing, laundering and concealing the proceeds of illegal activities.  In connection with my official duties as a Federal Law Enforcement Officer, I have been assigned or assisted with investigations involving drug trafficking and money laundering in violation of Titles 18 and Title 21 United States Code.   The investigations in which I have participated have resulted in the arrest, prosecution and conviction of individuals who have committed these crimes.

5.      I know, based on my training and experience, that persons engaged in drug trafficking and money laundering frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records.  Records of this kind are also often stored on computer media.

6.      I know that money launderers and narcotics traffickers attempt to conceal themselves from law enforcement by attempting to distance themselves from their criminal activity.  This is performed by utilizing fictitious or nominee names to account for their assets and accretion of wealth.  Often the money launderers and narcotics traffickers will utilize these other identities to register automobiles, boats, houses, telephone services, utility services, etc. in order to further secret their participation in criminal activity.  Another method used by leaders within a criminal enterprise to remain unnoticed by law enforcement is the utilization of other individuals

2

within their organization to perform specific acts in furtherance of the criminal activity, for example performing financial transactions utilizing the proceeds of their illegal activity or the purchase, sale and distribution of narcotics. In addition to concealing their identities, it is common for money launderers and narcotics traffickers to frequently change their forms of communication and methods of operation to avoid detection by law enforcement.

7.     Based upon my training and experience with money laundering and criminal investigations, combined with the knowledge and information concerning, controlled substances, and investigations thereof provided by other law enforcement officers, I know that:

a.     Drug dealers usually keep controlled substances and paraphernalia for packaging, cutting, weighing, transporting, and distributing controlled substances at places under their control, such as their residences, or in the control of their trusted associates. Drug paraphernalia is typically in close proximity to the locations of the controlled substances themselves.

b.     Persons involved in drug distribution and its related money laundering activities acquire and maintain records related to drug distribution and records relating to the acquisition and disposition of drug proceeds. Drug traffickers commonly create and maintain books, records, receipts, notes, ledgers, and documents reflecting the names, nicknames, addresses, telephone and pager and other contact numbers of their drug trafficking conspirators, including their sources of supply and their customers. These records typically document the following:

i.   amounts of money owed and amounts of drugs purchased by customers, as well as amounts of money owed to and amounts of drugs purchased from sources of supply;

ii.  transportation to acquire and to sell drugs;

3

iii. the purchase of drugs, drug packaging supplies, drug paraphernalia, and other assets used to facilitate the acquisition and sale of drugs; and

iv. the location of storage facilities and other stash locations to store drugs.

c.     Drug traffickers commonly profit and amass proceeds from their illicit activity.  In order to protect their illegal activity and be able to utilize the profits, they attempt to disguise and legitimize these profits through money laundering activities.

d.     Drug traffickers often purchase and/or title assets bought with illegal proceeds in fictitious names, aliases, names of relatives, associates, or business entities, who serve as "nominee" title holders while the criminals actually own and continue to use the assets and exercise dominion and control over the assets.

e.     Drug traffickers often engage in legitimate businesses as a "front" to launder drug proceeds.  The business front provides a means for the criminal to show that he/she has legitimate income, when, in fact, the income is solely from the criminal activity.  Records of such legitimate businesses funded by the proceeds of illegal activity constitute relevant evidence of money laundering offenses.

f.     Drug traffickers maintain records pertaining to their acquisition, conversion, movement, secreting, transfer, concealment and/or expenditure of drug proceeds, such as: currency, financial instruments and investments, real estate, automobiles, boats, other vehicles, home furnishings, stocks, bonds, precious metals and gemstones, jewelry, electronic equipment and other assets in the form of books, records, invoices, receipts, records of real estate transactions, purchase agreements, automobile titles, bank statements, financial statements, letters of credit, money orders, cashier's checks, safe deposit box agreements and keys, and money wrappers.

4

g.      Drug traffickers and their associates are known to use aliases, fictitious and multiple addresses, and multiple drivers' licenses, as well as maintain records of the same, in order to conceal their true identity and hinder law enforcement investigation of their illegal activity.

h.      Drug traffickers often obtain lines of credit, loans, or mortgages to purchase assets in which they have low equity interest to avoid seizure and forfeiture attempts by law enforcement authorities.

i.      Drug traffickers primarily utilize U.S. currency as the method of conducting their illegal activity.  Therefore, drug traffickers often maintain on hand and have quick access to large amounts of U.S. currency or other liquid assets in order to maintain and finance their ongoing criminal business.

j.      Drug traffickers often utilize electronic equipment such as computers, smartphones, tablet computers, currency counting machines, and telephone answering machines to generate, transfer, count, record, and/or store the information described in the preceding paragraphs.

k.      Drug traffickers often use telephones to facilitate their drug activities. Records of such telephone calls, including telephone bills, are commonly kept and maintained by the drug traffickers.

l.      Drug traffickers often take or cause to be taken photographs or video movies of themselves, their associates, their property and assets, and their product.

m.      Drug traffickers commonly maintain firearms, such as handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons.  These weapons are used to protect and secure their property, drugs, and cash stores from thieves, as drug traffickers are often the victims of robberies and "rip-offs" during a drug or other illegal transaction.  Because firearms are

in demand by drug dealers, such items are often bartered for drugs or other contraband. Indeed, the law has long recognized that the presence of firearms is relevant and probative of drug crimes, as such are tools of the trade of drug traffickers.

8.    Except as noted herein, all of the information contained in this affidavit is either known to me personally or has been told to me by other law enforcement officers, to include investigative reports by other officers.

### Court Authorized Title III Interceptions

9.    On January 8, 2019, a federal application and order to intercept the wire and electronic communications of Jerriod SIVELS over (423) 680-0530 (Target Telephone #1) and (615) 491-2638 (Target Telephone #2) was signed by the Honorable Judge Harry S. Mattice, Jr., United States District Judge, Eastern District of Tennessee. On February 6, 2019, the Honorable Judge Harry S. Mattice, Jr., signed an order authorizing the continued interception of Target Telephone #1 and Target Telephone #2. Interceptions occurred between January 8, 2019 and March 4, 2019.

10.    On January 18, 2019, a federal application and order to intercept the wire and electronic communications of Jerriod SIVELS over (423) 708-0796 (Target Telephone #4) was signed by the Honorable Judge Harry S. Mattice, Jr., United States District Judge, Eastern District of Tennessee. Interceptions occurred between January 18, 2019 and February 15, 2019.

11.    On February 19, 2019, a federal application and order to intercept the wire communications of Jamaal PARKER over (423) 383-6915 (hereinafter referred to as Target Telephone #3) was signed by the Honorable Judge Harry S. Mattice, Jr., United States District Judge, Eastern District of Tennessee. Interceptions occurred between February 19, 2019 and March 4, 2019.

## Property for Forfeiture

12.     This affidavit supports the civil forfeiture of real property, with all appurtenances, improvements, and attachments thereon, located at 500 Phoenix Avenue, Chattanooga, Tennessee 37411 and described as follows:

IN THE HAMILTON COUNTY, STATE OF TENNESSEE, DESCRIBED AS FOLLOWS, TO-WIT:

Lot Five Hundred Sixty-Four (564), Re-subdivision of East Highlands as shown by plat of record in Plat Book 9, Page 6, Register's Office Hamilton County, Tennessee.   According to said plat, said lot is more particularly described as follows: BEGINNING at a point on the East line of Phoenix Avenue one hundred thirty-eight (138) feet Northwardly as measured along the East line of Phoenix Avenue from its intersection with the North line of Chevoit Drive, if said lines are extended; thence Eastwardly one hundred thirty-five (135) feet to the West line of Lots 562; thence Northwardly along the dividing line of Lots 562 and 564, fifty-four (54) feet to the Southeast corner of Lot 563 and 564, one hundred thirty-five (135) feet to the East line of Phoenix Avenue; thence Southwardly along the East line of Phoenix Avenue, fifty-four (54) feet to the point of beginning.

Subject to restrictions as set out in instrument of record in Book 680, Page 633; as modified in Book 795, Page 682 and amended in Book 1129, Page 71, said Register's Office.

Subject to any governmental zoning and subdivision ordinances or regulations in effect thereon.

The Grantor's source of interest is a deed recorded in Book 20130, Page 159, in the Register's Office of Hamilton County, Tennessee.

This property is also commonly known as: 500 Phoenix Avenue, Chattanooga, Tennessee, this ifs for informational purposes only.

Map and Parcel #: 1470-C-020.04, this is for informational purposes only.

For further reference see Executrix's Deed filed and recorded on January 22, 2019, in Deed Book GI 11548, Page 936, in the Register's Office of Hamilton County, Tennessee, Instrument Number 2019012200339.

13.     Based on the information developed throughout this investigation and set out in this affidavit, I believe the subject property constitutes proceeds traceable to violations of 21 U.S.C. §§ 841 (Drug Distribution) and/or 846 (Drug Conspiracy) and is subject to civil forfeiture pursuant to 21 U.S.C. §§ 881(a)(6), and pursuant to 18 U.S.C. §§ 1956 and/or 1957 (Money Laundering) and is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## Drug Investigation Background

14.     In 2014, the ATF, Chattanooga Police Department, and other federal, state, and local law enforcement agencies began conducting an investigation into Jamaal PARKER.  In August 2018, the DEA, ATF, Chattanooga Police Department, and other federal, state, and local law enforcement agencies initiated an investigation into JERRIOD SIVELS, also known as "JERRIOD LEE," also known as "JERRIOD SIVELS-LEE," also known as "JERRY," also known as "LIL JERRY," also known as "BRMG JAY," JAMAAL PARKER, also known as "MAAL," also known as "MONEYMAAL," and other co-conspirators who are engaged in the distribution of cocaine, marijuana, and other narcotics in Tennessee, Georgia, and elsewhere. The investigation to date has revealed that PARKER and SIVELS are leaders within this DTO. Jamaal PARKER and Jerriod SIVELS control the sale and distribution of cocaine and marijuana in the Eastern District of Tennessee (EDTN) and distribution of cocaine and marijuana to subordinates in this DTO.

15.     During the course of this investigation, DEA and other law enforcement agencies have obtained information regarding PARKER and SIVELS DTO from several cooperating sources to include Confidential Source One, hereinafter "CS-1,"  Confidential Source Two, hereinafter, "CS-2", and Confidential Source Three, hereinafter "CS-3."

8

16.    Between 2014 and 2016, CS-1 has been interviewed in-person and over the telephone by Chattanooga Police Department detectives and ATF on numerous occasions regarding Jamaal PARKER. A substantial portion of the information provided by CS-1 has been corroborated by independent investigation, including physical surveillance, the review of DEA and ATF documents as well as other federal, state, and local documents, and interviews of other members of the above-stated drug trafficking organization. In 2014, CS-1 provided the following information regarding the PARKER ORGANIZATION. CS-1 identified Martrel ARNOLD, aka "Tricky Trel," as the leader of the Athens Park Bloods street gang in Chattanooga, Tennessee. CS-1 stated that ARNOLD was involved in distributing kilogram quantities of cocaine. Jamaal PARKER was identified as a cocaine source of supply to ARNOLD, Jerriod SIVELS, and Ricky HALFACRE.

17.    Between August 2015 and January 2019, CS-2 has been interviewed in-person and over the telephone by agents of ATF on numerous occasions. A substantial portion of the information provided by CS-2 has been corroborated by independent investigation, including physical surveillance, the review of DEA and ATF documents as well as other federal, state, and local documents, and interviews of other members of the above-stated drug trafficking organization. CS-2 identified Jamaal PARKER as a multi-kilogram distributor of cocaine in the Chattanooga, Tennessee area. CS-2 related that Jamaal PARKER was assisted in his drug distribution by several lower level distributors. CS-2 believed Jamaal PARKER's source of supply to be in the Atlanta, Georgia area.

18.    CS-3 has made multiple controlled purchases of cocaine from SIVELS as detailed below. Additionally, CS-3 was present for numerous calls and text messages wherein SIVELS discussed and facilitated drug trafficking.

19.     On July 11, 2016, ATF conducted a consensual interview with Cooperating Defendant One (hereinafter referred to as CD-1) subsequent to his state arrest on narcotic charges a few days prior.  A substantial portion of CD-1's information has been corroborated by independent investigation, including interviews of other sources, surveillance, and controlled purchases of narcotics.  During the interview, CD-1 identified Michael JACKSON as a distributor of heroin and crack cocaine in Chattanooga, Tennessee.  JACKSON's source of supply was named as Jamaal PARKER.  CD-1 stated that JACKSON would purchase between two and nine ounces of cocaine from Jamaal PARKER at a time.

20.     In April 2017, agents of the ATF met with CS-2 and formulated plans to make a controlled purchase of cocaine from Jamaal PARKER.  At that time, CS-2 advised agents that CS-2 had spoken to PARKER earlier and that PARKER had agreed to sell cocaine to CS-2.  CS-2 was then searched for contraband with negative results.  CS-2 was then provided with ATF funds for the purchase of cocaine and monitoring/recording equipment.  CS-2 departed the pre-buy location and was followed by surveillance to a store in Chattanooga, Tennessee.  Upon arrival to the store, CS-2 exited CS-2's vehicle and met with PARKER in PARKER's vehicle. CS-2 then exited PARKER's vehicle and departed the area.  CS-2 was followed by surveillance to a post-buy location.  Agents subsequently retrieved approximately 25 grams of cocaine from CS-2.  CS-2 was again searched for contraband with negative results.  CS-2 stated that CS-2 purchased the cocaine from PARKER while in PARKER's vehicle.  ATF field-tested the substance and it indicated positive for cocaine.  The drug exhibit was not submitted to the DEA laboratory for testing due to the ATF not seeking prosecution of the controlled purchase.

21.     On September 12, 2018, DEA met with CS-3 and obtained approximately 25 grams of cocaine from CS-3.  CS-3 related that SIVELS provided the cocaine to CS-3 on

consignment on September 11, 2018. On September 13, 2018, DEA met with CS-3 and formulated plans to make a controlled money payment to SIVELS for the cocaine received by CS-3 on September 11, 2018. At that time, CS-3 advised that CS-3 had sent a text message to Jerriod SIVELS at Target Telephone #1. This message was reviewed by agents on CS-3's cellular telephone and related that CS-3 had the money CS-3 owed and that CS-3 wanted to meet with Jerriod SIVELS. At approximately 2:35 p.m., CS-3 received an incoming recorded telephone call from Jerriod SIVELS. During the call, CS-3 stated, "I need to drop this off to you." Jerriod SIVELS replied, "I'm going to call you as soon as I get out." Based on my training, experience, and knowledge of this investigation, I believe that during this telephone call, CS-3 told Jerriod SIVELS he had money to pay Jerriod SIVELS for the previously received one ounce of cocaine, and Jerriod SIVELS told CS-3, he would call CS-3 soon. In subsequent recorded and monitored telephone calls between CS-3 and Jerriod SIVELS, Jerriod SIVELS directed CS-3 to meet a third party at a car wash in Chattanooga, Tennessee. At the direction of law enforcement, CS-3 subsequently met with and paid Anthony POINDEXTER $1,100.00 in pre-recorded DEA funds for the cocaine CS-3 obtained from Jerriod SIVELS on September 11, 2018. The cocaine was later sent to the DEA laboratory for testing and safekeeping and the lab results showed that the substance was 25.22 net grams of cocaine with a 14% purity.

22.     On October 4, 2018, law enforcement personnel met with CS-3 at a pre-arranged location and formulated plans to make a controlled purchase of one ounce of cocaine from Jerriod SIVELS. CS-3 subsequently had several recorded and monitored telephone conversations with Jerriod SIVELS in which Jerriod SIVELS agreed to meet with CS-3 to sell CS-3 cocaine. At the direction of law enforcement, CS-3 later met with Jerriod SIVELS and purchased approximately one ounce of cocaine from Jerriod SIVELS for $1,000.00 U.S. currency.

11

23.     On November 15, 2018, CS-3 made a recorded telephone call to Jerriod SIVELS at Target Telephone #1. Your Affiant and DEA Special Agent Andrew Bergren witnessed and monitored this phone call to include the telephone number dialed. During the call, CS-3 related that CS-3 had been needing Jerriod SIVELS. Jerriod SIVELS advised CS-3 that he had been in "county." Your Affiant is aware that Jerriod SIVELS was incarcerated in the Hamilton County Jail for a probation/parole violation between November 8 and November 13, 2018. CS-3 then told Jerriod SIVELS that he "would be ready tomorrow" and would need "more than usual." Jerriod SIVELS told CS-3 to "call when ready." Based on my training, experience, and knowledge of this investigation, I believe that during this conversation, CS-3 advised Jerriod SIVELS that CS-3 had needed to get additional cocaine from Jerriod SIVELS and Jerriod SIVELS advised that he had been incarcerated. CS-3 then informed Jerriod SIVELS that CS-3 wanted to purchase more than the usual one ounce of cocaine. Jerriod SIVELS then told CS-3 to contact him when CS-3 was ready.

24.     On November 16, 2018, CS-3 sent a text message to Jerriod SIVELS on Target Telephone #1 stating, "I'm gonna need 4 and a spit when you get up need it before 2pm I have to get on the high-way by that time get at me." Your Affiant is aware that "4 and spit" is a reference to 4 ½ ounces of cocaine. At approximately 11:50 a.m., CS-3 contacted law enforcement and advised that Jerriod SIVELS had called CS-3 from Target Telephone #1 and they agreed to meet in 45 minutes. At approximately 12:42 p.m., Jerriod SIVELS' vehicle was located at 3506 Hoyt Street, Chattanooga, Tennessee. At that same time, Jamaal PARKER's Chevrolet Silverado bearing Tennessee license plate 5G22P4 was observed parked in front of 3505 Hoyt Street, Chattanooga, Tennessee. Surveillance later observed a subject walk from 3505 Hoyt Street to 3506 Hoyt Street. Shortly thereafter, Jerriod SIVELS' vehicle was observed

12

to depart Hoyt Street.  Surveillance of Jerriod SIVELS was lost.  At approximately 12:55 p.m., surveillance observed Jerriod SIVELS parked at the arranged meet location.  After the meeting, law enforcement met with CS-3 and found that Jerriod SIVELS had only provided CS-3 with approximately three ounces of cocaine.  At the direction of law enforcement, CS-3 contacted Jerriod SIVELS and arranged to meet him back at the original meet location.  CS-3 then returned to the meet location and received a second bag of cocaine from an uninvolved party that Jerriod SIVELS had left at the meet location for CS-3.  In total, law enforcement recovered approximately 111 grams of cocaine from CS-3.   At approximately 1:22 p.m., CS-3 sent a text message to Jerriod SIVELS at Target Telephone #1 stating in part, "I'm good fam I got it." Based on my training, experience, and knowledge of this investigation, I believe that in this text message, CS-3 told Jerriod SIVELS that he obtained the additional ounce of cocaine Jerriod SIVELS had left with the third party.

25.     On December 5, 2018, Chattanooga Police Department Officer Dennis Harrison conducted a traffic stop on a black 2015 Chevrolet Silverado bearing Tennessee license plate 5G22P4, registered to and driven by Jamaal PARKER.  Officer Harrison attempted to conduct a traffic stop on this same vehicle approximately 1 ½ weeks prior and the driver of the vehicle fled from the traffic stop and was not apprehended.  During the traffic stop, Officer Harrison located approximately $7,559.00 on Jamaal PARKER's person and in the vehicle.  Officer Harrison also found a drug ledger in the vehicle with various names and/or abbreviations with money amounts written next to them.  Two of the ledger entries were "KO" with the number 250 written next to it and "Bug" with the "500 1000 + 200 written next to it with the numbers 500 and 200 scratched out.  Your Affiant believes that "KO" is a reference to Broderick LAY and "Bug" is a reference to Lovest CARTER.  CARTER is a co-defendant of Jerriod SIVELS and Jamaal PARKER in the

13

instant investigation. Jamaal PARKER was subsequently released from the traffic stop without charges.

26.     On January 16, 2019, the DEA formulated plans to make a controlled purchase of cocaine from Jerriod SIVELS. At approximately 4:35 p.m., CS-3 made a recorded telephone call to Jerriod SIVELS on Target Telephone #1. During the call, CS-3 stated, "We'll need ya in about 45 minutes" and Jerriod SIVELS responded, "Alright, call me." Based on my training, experience, and knowledge of this investigation, I believe that during this call, CS-3 advised Jerriod SIVELS that CS-3 needed to purchase cocaine and Jerriod SIVELS agreed. Surveillance was subsequently established at Jerriod SIVELS' residences, located at 207 Gillespie Terrace and at 3505/3506 Hoyt Street, Chattanooga, TN. At approximately 5:03 p.m., surveillance officers observed Jerriod SIVELS depart Gillespie Terrace in a blue Hyundai SUV bearing license New York license plates JEF9822. CS-3 then drove to the arranged meet location in Chattanooga, Tennessee. Surveillance was maintained on CS-3. At approximately 5:09 p.m., CS-3 called SIVELS and advised CS-3 was "at the house." This call was intercepted pursuant to court-authorized interceptions of Target Telephone #1. At approximately 5:27 p.m., Jerriod SIVELS was observed by surveillance arriving at 3505 Hoyt Street. At approximately 5:33 p.m., Jerriod SIVELS was observed departing Hoyt Street. At approximately 5:38 p.m., surveillance observed Jerriod SIVELS' arrive to the meet location. At that time, CS-3 walked to Jerriod SIVELS' vehicle and entered the rear of the vehicle.

27.     Law enforcement then met with CS-3 at a pre-arranged location and retrieved approximately 50 grams of cocaine from CS-3. CS-3 advised that Jerriod SIVELS had a small cooler that he retrieved the cocaine from and when he did, CS-3 observed approximately five to six additional ounces of cocaine in the cooler. The cocaine was later field-tested and tested

14

positive for cocaine. The cocaine was subsequently sent to the DEA laboratory for testing and safekeeping and the results are pending. Based on my training, experience, and knowledge of this investigation, I believe that Jerriod SIVELS obtained the cocaine supplied to CS-3 from 3505 Hoyt Street, Chattanooga, Tennessee.

28.     On January 17, 2019, at approximately 2:07 p.m., Target Telephone #1 received an incoming telephone call from telephone number 470-680-0530, utilized by Darious GARRETT. During the call, GARRETT asked Jerriod SIVELS, "Have you made it out yet?" Jerriod SIVELS replied, "Yeah, I finna come out now." GARRETT then stated, "Alright, yeah, I need, my boy wanted to holla at you." Jerriod SIVELS then stated, "I won't be long bout twenty minutes." Based on my training, experience, and knowledge of this investigation, I believe that during this telephone call, GARRETT related that he wanted to meet with Jerriod SIVELS to conduct a drug transaction and that Jerriod SIVELS told GARRETT that he was getting ready to leave his residence and would be at 3505 Hoyt Street, Chattanooga, Tennessee in twenty minutes.

29.     At approximately 2:40 p.m., surveillance officers observed GARRETT arrive and park at 3505 Hoyt Street, Chattanooga, Tennessee. At this same time, law enforcement observed Jerriod SIVELS depart his Gillespie Terrace residence and drive to 3506 Hoyt Street, Chattanooga, Tennessee. Jerriod SIVELS was then observed by surveillance to walk across the street to 3505 Hoyt Street. At approximately 2:48 p.m., law enforcement observed GARRETT depart the residence. Shortly thereafter, a Chattanooga Police Department Officer conducted a traffic stop on GARRETT's vehicle for a window tint violation. A probable cause search of the vehicle was subsequently conducted and resulted in the seizure of 29.6 grams of cocaine, 15 grams of crack cocaine, 2.9 grams of marijuana, and 1.1 grams of suspected MDMA from a

15

camera bag located in the passenger's, Shawanna MURRAY, purse. The cocaine was subsequently field-tested and positive results for cocaine were obtained. The seized narcotics were subsequently sent to the DEA laboratory for testing and safekeeping and the results are pending. Based on my training, experience, and knowledge of this investigation, I believe that GARRETT met with and obtained the seized cocaine from Jerriod SIVELS at 3505 Hoyt Street, Chattanooga, Tennessee.

30.     On January 21, 2019, at approximately 5:50 p.m., Target Telephone #1 made an outgoing telephone call to telephone number 423-800-3408, utilized by an unknown male. During the telephone call, Jerriod SIVELS asked, "What's up dude? Where you at?" The unknown male replied, "On the block." Jerriod SIVELS replied, "Alright." At approximately 7:10 p.m., Target Telephone #1 received an incoming call from telephone number 423-800-3408, utilized by an unknown male. During the telephone call, the unknown male stated, "Hey kin folk. I need that plus two." At approximately 7:56 p.m., Target Telephone #1 received an incoming telephone call from telephone number 423-800-3408, utilized by an unknown male. During the call, the unknown male stated, "Hey I'm here, at right here." Jerriod SIVELS replied, "You over there?" and "Okay here I come." Based on my training, experience, and knowledge of this investigation, I believe that during these telephone calls, Jerriod SIVELS and an unknown male discussed meeting at 3505 Hoyt Street, Chattanooga, Tennessee to conduct a drug transaction for cocaine.

31.     At approximately 8:15 p.m., surveillance officers observed a green colored Dodge Charger park in front of the driveway at 3505 Hoyt Street. Jamaal PARKER's Chevrolet Silverado pick-up truck was observed in the driveway of 3505 Hoyt Street at this same time. Shortly thereafter, an unknown male could be observed walking back to the vehicle from 3505

Hoyt Street and departing. Surveillance was maintained on the vehicle. At approximately 8:26

p.m., a Chattanooga Police Department officer initiated a traffic stop on the vehicle. As the

vehicle fled from the traffic stop, the officer observed items being tossed out of the vehicle. The

officer subsequently stopped and recovered approximately 57.2 grams of cocaine, 84.8 grams of

crack cocaine, and 38.9 grams of marijuana from the area in which the officer observed the items

discarded. The driver of this vehicle was later identified as Deonta BANKS. The crack cocaine

and cocaine were subsequently field-tested and indicated positive for cocaine. The seized items

were subsequently sent to the DEA laboratory for testing and safekeeping and the results are

pending. Based on my training, experience, and knowledge of this investigation, I believe

BANKS met with and purchased cocaine from Jerriod SIVELS at 3505 Hoyt Street,

Chattanooga, Tennessee prior to the above detailed traffic stop.

      32.     On February 6, 2019, at approximately 3:08 p.m., Target Telephone #2, utilized

by Jerriod SIVELS, received an incoming telephone call from Target Telephone #3, utilized by

Jamaal PARKER. During the call, Jamaal PARKER stated, "Twan and Unc want to come, want

to know if you can talk to them." Jerriod SIVELS replied, "I can't hear you." Jamaal PARKER

then stated, "Twan, Big and Twan want you know, can he come talk to you." Jerriod SIVELS

replied, "Yeah, tell them to come on." Jamaal PARKER then tells Jerriod SIVELS that "Unc is

in a blue car." Jamaal PARKER later identifies "Unc" as "J Rock." Based on my training,

experience, and knowledge of this investigation, I believe that during this telephone call, Jamaal

PARKER was sending two drug customers to Jerriod SIVELS.

      33.     On February 16, 2019, law enforcement conducted surveillance on Jerriod

SIVELS and Jamaal PARKER subsequent to intercepted communications on February 15, 2019,

which indicated that Jerriod SIVELS would be meeting with his cocaine source of supply the

following day. At approximately 10:05 a.m., Jerriod SIVELS was observed by surveillance to arrive to 3505 Hoyt Street, Chattanooga, Tennessee. At approximately 11:10 a.m., camera surveillance showed Jerriod SIVELS depart Hoyt Street. Surveillance was maintained on Jerriod SIVELS. At approximately 11:34 a.m., Jerriod SIVELS was observed parking at the known residence of Jamaal PARKER. At approximately 12:35 p.m., Jerriod SIVELS and Jamaal PARKER were observed to depart the residence and surveillance was maintained on both subjects. Jerriod SIVELS and Jamaal PARKER were later observed at 207 Gillespie Terrace, Chattanooga, Tennessee and then back at 3505 Hoyt Street, Chattanooga, Tennessee. At approximately 2:36 p.m., Jamaal PARKER's vehicle was observed leaving 3505 Hoyt Street, Chattanooga, Tennessee. Both Jamaal PARKER and Jerriod SIVELS were occupants of the vehicle. The vehicle was then followed by surveillance to Anthony POINDEXTER's residence in Chattanooga, Tennessee. At approximately 3:02 p.m., Jamaal PARKER and Jerriod SIVELS departed the residence in Jamaal PARKER's vehicle and POINDEXTER departed in his vehicle. Surveillance was maintained on both vehicles. At approximately 4:55 p.m., law enforcement determined that both vehicles were at a residence in Atlanta, Georgia. At approximately 5:18 p.m., both vehicles departed the Atlanta residence.

34. At approximately 5:52 p.m., Georgia State Police (GSP) officers initiated a traffic stop on POINDEXTER for traffic violations. At approximately 5:53 p.m., Target Telephone #2 received an incoming telephone call from POINDEXTER. During the call, POINDEXTER stated, "Hey, they just pulled me over man. Bartow County man." Jerriod SIVELS replied, "For real?" POINDEXTER then stated, "Yeah, yeah man" and Jerriod SIVELS replied, "God damn." A subsequent probable cause search of POINDEXTER's vehicle resulted in the seizure of approximately eight kilograms of cocaine from a black gym bag located on the rear seat of the

18

vehicle. POINDEXTER was subsequently arrested and transported to the Bartow County jail. The cocaine was later field-tested and it tested positive for cocaine. The cocaine was subsequently sent to the DEA laboratory for testing and safekeeping and the results are pending.

35.     On February 21, 2019, Target Telephone #3, utilized by Jamaal PARKER, received an incoming telephone call from telephone number 404-661-2514, utilized by an unknown male. During the telephone call, Jamaal PARKER stated, "But look bro, we just took a, we took a major loss bro. You hear me but we still alright." Jamaal PARKER later stated, "Look we just took a major loss but we still going push this shit." Based on my training, experience, and knowledge of this investigation, I believe that during this call, Jamaal PARKER told the unknown male that although they took a "major loss," referring to the seizure of eight kilograms from Anthony POINDEXTER on February 19, 2019, they were still conducting business.

36.     On March 2, 2019, at approximately 1:55 p.m., Target Telephone #2 made an outgoing telephone call to telephone number 404-210-1938, utilized by Nathaniel WILKINS, Jerriod SIVELS' and Jamaal PARKER's cocaine source of supply. During the telephone call, Jerriod SIVELS stated, "Shit, umm you around?" and "I'm trying to come see you today." WILKINS replied, "Shit, what you, what you talking about? Just text me then I'll let you know," and "You got, you got, you got that other thing for me?" Jerriod SIVELS replied, "Man, them mother fuckers wasn't even right man," and "Hell no, hell no, I'm going to get my money back." WILKINS then stated, "Aight, you got to let me know cause I'm kind of low on our end, I'm low." SIVELS answered, "Uh, shit shit, shit, shit, shit, shit, shit, Aight I'm fixin, uh, I'm fixin to figure this shit out. I'm fixin to hit you right back." WILKINS stated again, "I'm telling you I'm low," and SIVELS replied, "Aight, that's what I'm sayin. I'm fixin uh, I'm

coming through, I'm fixin to come through." Based on my training, experience, and knowledge of this investigation, I believe that during this call, WILKINS told Jerriod SIVELS he was low on cocaine, and Jerriod SIVELS stated that he was coming to see WILKINS.

37.     At approximately 1:57 p.m., Target Telephone #2 made an outgoing phone call to telephone number 404-210-1938, utilized by WILKINS. During the call, SIVELS stated, "Trying to see if you'll stop by the liquor store and grab me like three bottles of Hennessey." WILKINS replied, "Is that what you want?" and "What you want, the big bottles?" SIVELS replied, "Yeah, the big bottles of Hennessey." WILKINS then stated, "Aight." Based on my training, experience, and knowledge of this investigation, I believe that during this telephone call, Jerriod SIVELS referred to cocaine in coded language as "bottles of Hennessey" and relayed to WILKINS that he wanted three kilograms of cocaine.

38.     At approximately 2:45 p.m., surveillance already established at 207 Gillespie Terrace, Chattanooga, Tennessee observed Jerriod SIVELS and Jamaal PARKER depart the residence. Surveillance was maintained on Jamaal PARKER. Jamaal PARKER was later followed to his residence located at 228 Carriage Parc Drive, Chattanooga, Tennessee and then to southbound Interstate 75. Jamaal PARKER was driving a black Chevrolet Silverado 2500 bearing Tennessee license plate 5G22P4.

39.     At approximately 5:27 p.m., Jamaal PARKER received an incoming telephone call on Target Telephone #3 from Jerriod SIVELS on Target Telephone #2. During their conversation, Jerriod SIVELS advised, "Yeah, my phone on silent. Whatcha doing?" Jamaal PARKER replied, "Getting on the road." Jerriod SIVELS then stated, "Alright, dude had just called," and Jamaal PARKER replied, "You gonna call him? I'm in Rome?" Jerriod SIVELS then stated, "Alright, just give him a call when ya get closer." Based on my training,

experience, and knowledge of this investigation, I believe that during this telephone call, Jerriod SIVELS told Jamaal PARKER to contact WILKINS when he got close to WILKINS' residence.

40.     At approximately 6:32 p.m., Jamaal PARKER's vehicle was observed parked at a residence in Atlanta, Georgia.  At approximately 6:40 p.m., Jamaal PARKER departed the residence and surveillance was maintained on his vehicle.

41.     At approximately 10:08 p.m., a Georgia State Patrol trooper initiated a traffic stop on Jamaal PARKER's vehicle on Interstate 75 North near mile marker 293.  Jamaal PARKER initially stopped his vehicle along the right hand shoulder of the roadway and then fled from law enforcement in his vehicle.  Georgia State Patrol troopers pursued Jamaal PARKER North on Interstate 75.  Georgia State Patrol executed a P.I.T. maneuver of Jamaal PARKER's vehicle in an attempt to stop Jamaal PARKER.  Jamaal PARKER crashed his vehicle into a guardrail along the right hand shoulder of the northbound side of Interstate 75.  Jamaal PARKER exited the vehicle carrying a dark backpack and took flight on foot across the north and southbound lanes of Interstate 75.  DEA Atlanta agents and members of the Georgia State Patrol pursued Jamaal PARKER.  Jamaal PARKER was apprehended on the southbound right hand shoulder of the roadway.  Jamaal PARKER was carrying the dark backpack.  A DEA Atlanta agent recovered the backpack from Jamaal PARKER and conducted a search incident to arrest.  Inside the backpack, the DEA Atlanta agent located four, one-kilogram rectangular packages of cocaine.  A probable cause search of the vehicle lead to the discovery of a Springfield XD handgun in the driver side floorboard.  Based on my training, experience, and knowledge of this investigation, I believe that Jamaal PARKER obtained the four kilograms of cocaine from WILKINS while in Atlanta, Georgia.

42.     On March 3, 2019, at approximately 12:50 a.m., Jerriod SIVELS was arrested in Chattanooga, Tennessee.  At the time of his arrest, a firearm and miscellaneous documents were seized from Jerriod SIVELS and his vehicle.  The documents included a drug ledger with various initials and names with numeric values written next to the names.

43.     On March 3, 2019, a federal search warrant was executed at 3505 Hoyt Street, Chattanooga, Tennessee.  The search warrant resulted in the seizure of cocaine, crack cocaine, Promethazine, and a hydraulic press with kilogram molds.  Also located in the residence were miscellaneous items consistent with the processing and packaging of narcotics.  These items included numerous digital scales, Pyrex glassware with suspected cocaine residue, numerous boxes of baking soda, Inositol, razor blades with white residue, and filtering masks.   Based on my training, experience, and knowledge of this investigation, I believe that items seized and located at 3505 Hoyt Street, Chattanooga, Tennessee, the subject residence was being utilized by Jerriod SIVELS and Jamaal PARKER to store, process, and distribute cocaine, marijuana, and other controlled substances.

44.     In March 2019, a cooperating defendant, hereinafter CD-2, was interviewed by DEA.  A substantial portion of the information provided by CD-2 was corroborated by independent investigation, including physical surveillance, the review of DEA and ATF documents as well as other federal, state, and local documents, interviews of other members of the above-stated drug trafficking organization, controlled purchases of narcotics, and court-authorized interception of wire and electronic communications.  During the interview, CD-2 stated that CD-2 knew Jerriod SIVELS and Jamaal PARKER for approximately ten years.  CD-2 did not know Jerriod SIVELS or Jamaal PARKER to have employment during that period.  CD-2 advised that CD-2 was a cocaine user and was frequently supplied user quantities cocaine from

Jerriod SIVELS and from members of Jerriod SIVELS' drug organization. CD-2 stated that CD-2 brokered cocaine transactions between several customers that CD-2 knew and Jerriod SIVELS. CD-2 stated that CD-2 would frequently collect drug debts from these persons for Jerriod SIVELS. CD-2 further stated that Jerriod SIVELS and Jamaal PARKER previously distributed cocaine from 617 Shannon Avenue, Chattanooga, Tennessee but began distributing from 3505 Hoyt Street, Chattanooga, Tennessee shortly after Jerriod SIVELS acquired the property.

45.     An Indictment was filed on March 26, 2019 in the Eastern District of Tennessee, charging Jerriod SIVELS, Jamaal PARKER, and others with conspiracy to distribute and possess five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), 841(b)(1)(B) and 841(b)(1)(C). On April 23, 2019, a Superseding Indictment was filed in the Eastern District of Tennessee, charging violations of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), 841(b)(1)(C), 856(a)(1) and 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 2, among other violations. The Superseding Indictment included forfeiture allegations of the subject property pursuant to 21 U.S.C. § 853 and 18 U.S.C. § 982(a)(1).

46.     On January 21, 2019, Jamaal T. PARKER and Jerriod LEE[1], with listed addresses of 3506 Hoyt Street, Chattanooga, TN 37411, purchased 500 Phoenix Avenue for $25,000.00. Closing documents indicate that the purchase of the property was a "cash sale." Closing documents further indicate that cashier's checks in the amount of $790.00 and $845.63 were produced by PARKER and LEE for closing costs.

47.     Your Affiant is not aware of Jerriod SIVELS having any legitimate employment. Your Affiant is further aware that after Jerriod SIVELS' arrest, he submitted a financial affidavit to the court which indicated Jerriod SIVELS was not employed.

---

[1] "Jerriod Lee" is an alias used by SIVELS.

48.     Your Affiant is not aware of Jamaal T. PARKER having any legitimate employment.  Your Affiant is further aware that after Jamaal T. PARKER'S arrest, he submitted a financial affidavit to the court which indicated Jamaal T. PARKER was not employed.

49.     Your Affiant requested tax returns for Jamaal PARKER for the years 2015 through 2018.  No returns were filed during that time period for PARKER.

50.     Through the course of this investigation, the DEA has learned that Jerriod SIVELS and Jamaal PARKER have been involved in the distribution of cocaine, marijuana, and other controlled substances since at least 2014.  Jerriod SIVELS only known source of legitimate income is through rental properties owned by Jerriod SIVELS at 3604 and 3606 3rd Avenue, Chattanooga, Tennessee.   Jamaal PARKER has no known source of legitimate income. Information obtained through surveillance, controlled purchases of narcotics, interviews of cooperating sources and cooperating defendants, and court-authorized wiretaps has shown that Jerriod SIVELS and Jamaal PARKER's primary source of income has been through the sale of narcotics and that the subject property was purchased during the course of the charged conspiracy.

**CONCLUSION**

51.     The subject property is derived from proceeds traceable to violations of property derived from proceeds traceable to violations of 21 U.S.C. §§ 841 (Drug Distribution) and/or 846 (Drug Conspiracy) and is subject to civil forfeiture pursuant to 21 U.S.C. § 881(a)(6), and pursuant to 18 U.S.C. §§ 1956 and/or 1957 (Money Laundering) and is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

All of the above information is true and correct to the best of my knowledge.

FURTHER, YOUR AFFIANT SAYETH NOT.

_William C. Wise_

William C. Wise
Special Agent
Drug Enforcement Administration

STATE OF TENNESSEE

COUNTY OF HAMILTON

    On this ___13th___ day of May, 2019, before me, personally appeared William C. Wise, in his capacity as a Special Agent with the Drug Enforcement Administration, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that she executed the same as her free act and deed.

    IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal.

    Subscribed to and sworn before me on this this ___13th___ day of May, 2019.

_Terrie L. Scharer_

NOTARY PUBLIC

My Commission Expires: _11-26-22_